UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUSTEM NURLYBAYEV, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| BLUE APRON HOLDINGS, INC., MATTHEW B. SALZBERG, ILIA M. PAPAS, MATTHEW J. WADIAK, JARED CLUFF, PABLO CUSSATTI, BENJAMIN C. SINGER, JULIE M.B. BRADLEY, TRACY BRITT COOL, KENNETH A. FOX, ROBERT P. GOODMAN, GARY R. HIRSHBERG, BRIAN P. KELLEY, BRADLEY J. DICKERSON, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, CITIGROUP GLOBAL MARKETS INC., BARCLAYS CAPITAL INC., RBC CAPITAL MARKETS, LLC, SUNTRUST ROBINSON HUMPHREY, INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED, CANACCORD GENUITY INC., NEEDHAM & COMPANY, LLC, OPPENHEIMER & CO. INC., RAYMOND JAMES & ASSOCIATES, INC., and WILLIAM BLAIR & COMPANY, L.L.C., | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Rustem Nurlybayev ("Plaintiff") , individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Blue Apron Holdings, Inc., ("Blue Apron" or the

"Company"), and information readily obtainable on the Internet.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities other than defendants who purchased or otherwise acquired the publicly traded securities of Blue Apron pursuant and/or traceable to the Company's initial public offering (the "IPO"), seeking to recover compensable damages caused by defendants' violations of the federal securities laws.

2.      Less than two months after going public, on August 10, 2017 Blue Apron shocked the stock market by announcing significant undisclosed problems, lowering its guidance for the second half of 2017, and stating that it planned to change its strategic approach for managing the business for the remainder of 2017.   On this news, the Company's stock price plummeted to approximately $5 per share – a 50% decline from the IPO price of $10.

3.      In response to this news, the Underwriter Defendants named herein drastically lowered their ratings on the stock and slashed their price targets for Blue Apron stock.   The Company's IPO has been the worst performing IPO of 2017.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§77k and 77o).

5.      This Court has jurisdiction over this action pursuant to §22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331.

6.      Venue is properly laid in this District pursuant to § 22 of the Securities Act and 28 U.S.C. § 1391(b) as a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

7.      In connection with the acts, conduct and other wrongs alleged in this complaint,

defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

8.      Plaintiff, as set forth in the accompanying certification, incorporated by referenced herein, purchased the Company's securities pursuant and/or traceable to the Company's Registration Statement for the IPO and was economically damaged thereby.

9.      Defendant Blue Apron was founded in 2012 and is an ingredient-and-recipe meal kit service. Blue Apron also sells wine, kitchen tools and staples that are used in their test kitchens where new recipes are created.  Blue Apron Holdings, Inc., the issuer in this offering, was incorporated in Delaware on December 22, 2016 to enable Blue Apron, Inc. to implement a holding company organizational structure, effected by a merger conducted pursuant to Section 251(g) of the General Corporation Law of the State of Delaware.  Blue Apron Holdings, Inc. maintains its principal executive office at 5 Crosby Street, New York, New York 10013.

10.     Defendant Matt Salzberg ("Salzberg") was, at all relevant times, a Founder, President, Chief Executive Officer ("CEO") and director of Blue Apron.

11.     Defendant Bradley Dickerson ("Dickerson") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Treasurer.

12.     Defendant Pablo Cussatti ("Cussatti") was, at all relevant times, the Company's Senior Vice President of Operations and Fulfillment.

13.     Defendant Ilia Papas ("Papas") was, at all relevant times, the Company's Chief Technology Officer.

14.     Defendant Matthew J. Wadiak ("Wadiak") was, at all relevant times, the Company's Chief Operating Officer ("COO").

15.     Defendant Jared Cluff ("Cluff") was, at all relevant times, the Company's Chief Marketing Officer ("CMO").

16.    Defendant Benjamin C. Singer ("Singer") was, at all relevant times, the Company's Secretary and general counsel.

17.    Defendant Julie M.B. Bradley ("Bradley") has been a Director of Blue Apron's Board since November 2015 and is a member of the audit committee and compensation committee.

18.    Defendant Tracy Britt Cool ("Cool") has been a Director of Blue Apron's Board since January 2017 and is a member of the audit committee and the nominating and corporate governance committee.

19.    Defendant Kenneth A. Fox ("Fox") has been a Director of Blue Apron's Board since April 2014 and is a member of the audit committee.

20.    Defendant Robert P. Goodman ("Goodman") has been a Director of Blue Apron's Board since November 2015 and is a member of the compensation committee.

21.    Defendant Gary R. Hirshberg ("Hirshberg") has been a Director of Blue Apron's Board since October 2016, and is a member of the compensation committee and the nominating and corporate governance committee.

22.    Defendant Brian P. Kelley ("Kelley") has been a Director of Blue Apron's Board since April 2017, and is a member of the nominating and corporate governance committee.

23.    <u>Underwriter Defendants</u> -- Under the terms and subject to the conditions in an underwriting agreement dated on or about June 29, 2017, the underwriters named below (the "Underwriter Defendants") severally agreed to purchase, and Blue Apron agreed to sell to them, severally, the number of shares indicated below, for which the Underwriter Defendants collectively were paid $16,500,000 in commissions:

| Name | Number of Shares |
| --- | --- |
| Goldman Sachs & Co. LLC | 8,700,000 |
| Morgan Stanley & Co. LLC | 7,200,000 |
| Citigroup Global Markets Inc. | 4,200,000 |
| Barclays Capital Inc. | 2,700,000 |
| RBC Capital Markets, LLC | 1,800,000 |

| | |
|---|---|
| SunTrust Robinson Humphrey, Inc. | 1,500,000 |
| Stifel, Nicolaus & Company, Incorporated | 900,000 |
| Canaccord Genuity Inc. | 600,000 |
| Needham & Company, LLC | 600,000 |
| Oppenheimer & Co. Inc. | 600,000 |
| Raymond James & Associates, Inc. | 600,000 |
| William Blair & Company, L.L.C | 600,000 |
| **TOTAL** | **30,000,000** |

24.     Goldman Sachs & Co. LLC acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above.  The company provides financial services to corporations, governments, financial institutions, and individuals in Europe, the Middle East, Africa, the Americas, and Asia.  It provides various services, such as capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate, and project finance; corporate lending; sales, trading, financing, and market-making activities in equity and fixed income securities and related products comprising foreign exchange and commodities; and investment activities. Goldman Sachs is headquartered at 200 West Street, New York, NY 10282.

25.     Morgan Stanley & Co. LLC acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above.  The company provides financial services to corporations, governments, financial institutions, and individuals in Europe, the Middle East, Africa, the Americas, and Asia.  It provides various services, such as capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate, and project finance; corporate lending; sales, trading, financing, and market-making activities in equity and fixed income securities and related products comprising foreign exchange and commodities; and investment activities. Morgan Stanley is headquartered at 1585 Broadway, New York, NY 10036-8293.

26.     Citigroup Global Markets Inc. acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above.  Citigroup Global Markets Inc. provides investment banking and financial advisory services.  The firm offers equity and debt financing, asset transaction, private equity, underwriting, institutional sales and

trading, and mergers and acquisitions advisory services. Citigroup Global Markets Inc. was formerly known as Salomon Smith Barney Inc. and changed its name in April 2003. The firm is based in New York, New York. Citigroup Global Markets Inc. operates as a subsidiary of Citigroup Financial Products Inc. The company is located at 390-388 Greenwich Street, New York, NY 10013-2396.

27.      Barclays Capital Inc. acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above. The company is an investment bank and is located at 745 7th Avenue, New York, NY 10019.

28.      RBC Capital Markets, LLC acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above. RBC Capital Markets is a global investment bank providing services in banking, finance and capital markets to corporations, institutional investors, asset managers and governments globally. RBC Capital Markets LLC is headquartered at 200 Vesey Street, 3 World Financial Center, 8th Floor, New York, NY 10281.

29.      Suntrust Robinson Humphrey, Inc. acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above. SunTrust maintains offices at 3333 Peachtree Road North East, Atlanta Financial Center, South Tower, 9th Floor, Atlanta, GA 30326-1070.

30.      Stifel, Nicolaus & Company, Incorporated acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above. Stifel is headquartered at 501 North Broadway, One Financial Plaza, St. Louis, MO 63102.

31.      Canaccord Genuity Inc. acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above. Canaccord Genuity Group Inc. is a global, full-service investment banking and financial services company that specializes in wealth management and brokerage in capital markets. Concord Genuity is headquartered at 99 High Street, Suite 1200, Boston, MA 02110.

32.      Needham & Company, LLC acted as an underwriter for Blue Apron's IPO and

solicited and sold the number of shares of Blue Apron indicated above.  Needham & Company LLC is headquartered at 445 Park Avenue, New York, NY 10022.

33.     Raymond James & Associates, Inc. acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above.  Raymond James has it main office at 880 Carillon Parkway, St. Petersburg, FL 33716-1102.

34.     William Blair & Company, L.L.C. acted as an underwriter for Blue Apron's IPO and solicited and sold the number of shares of Blue Apron indicated above.  William Blair & Company is a privately held, employee-owned financial services firm that provides investment banking, equity research, brokerage, asset management and private capital services.  Raymond James is headquartered at 222 West Adams Street, Chicago, IL 60606.

35.     The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement because:

A.      The Underwriter Defendants assisted Blue Apron and the Individual Defendants in planning the IPO and were required to conduct an adequate and reasonable investigation into the business and operations of Blue Apron – a process known as a "due diligence" investigation.   The Underwriter Defendants were required to conduct a diligence investigation in order to participate in the IPO.  During the course of their "due diligence investigation" the Underwriter Defendants had continual access to confidential corporate information concerning Blue Apron's operations and financial prospects.

B.      In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Blue Apron's lawyers, management and top executives and engaged in "drafting sessions" between at least February 2017 and June 2017.  During these sessions, the Underwriter Defendants, Blue Apron, and/or the Individual Defendants made joint decisions regarding:  (i) the terms of the IPO, including the price at which Blue Apron shares would be sold to the public; (ii) the strategy to best accomplish the IPO; (iii) the information to be included in the Registration Statement; and (iv) what responses would be made to the SEC in

connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Blue Apron's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Blue Apron's existing problems as detailed herein.

36.     Defendants Matthew B. Salzberg, Bradley J. Dickerson, Julie M.B. Bradley, Tracy Britt Cool, Kenneth A. Fox, Robert P. Goodman, Gary R. Hirshberg, Brian P. Kelley, and Benjamin C. Singer are collectively referred to herein as the "Individual Defendants."

37.     The Individual Defendants signed, or authorized the signing of, the Registration Statement (defined below).

38.     Each of the Individual Defendants:

      a.     directly participated in the management of the Company;

      b.     was directly involved in the day-to-day operations of the Company at the highest levels;

      c.     was privy to confidential proprietary information concerning the Company and its business and operations;

      d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

      e.     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

      f.     was award of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

      g.     approved or ratified these statements in violation of the federal securities laws.

39.     Blue Apron is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

40.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

41.     The Company and Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

42.     Pursuant to the Securities Act, Defendants are strictly liable for material misstatements in the Offering Materials issued in connection with the IPO.  The Securities Act claims asserted herein specifically exclude any allegations of fraud, knowledge, recklessness or scienter, do not "sound in fraud" and are based solely on strict liability and negligence.

### Background

43.     On March 31, 2017, Blue Apron filed a Draft Registration Statement with the SEC.  On June 1, 2017, Blue Apron filed a Registration Statement on Form S-1 with the SEC.  On June 28, 2017, Blue Apron filed its final amendment to the Registration Statement, which registered over 34 million Blue Apron shares for public sale.

44.     The Registration Statement contained a preliminary prospectus.  The S-1 Registration Statement was declared effective by the SEC on June 28, 2017, and Blue Apron filed its final prospectus with the SEC on June 29, 2017 (the "Prospectus").  The Registration Statement and the Prospectus are collectively referred to herein as the "Registration Statement."

45.     Blue Apron priced the IPO at $10.00 per share.  Through the IPO, defendants issued and sold over 30 million shares.  After deducting underwriting fees of $16.5 million, the Company generated $283,500,000 in proceeds for the Company, before expenses.

### Materially False and Misleading Statements

46.     The Registration Statement, signed by each of the Individual Defendants, stated the following:

> We have reimagined the traditional grocery business model and developed an integrated ecosystem that employs technology and expertise across many disciplines.  Our supply-demand coordination activities—demand planning, recipe creation, recipe merchandising, and marketing—drive our end-to-end value

chain. We gather and infer information about our customers' tastes, food preferences, and order behavior to forecast near-term and long-term demand. We also manage and influence demand, including through our content, proprietary software tools, and e-commerce experience. For example, our flexible recipe design process allows us to adjust recipes close to the time of delivery, enabling us to coordinate customer preferences with expected ingredient supply to help mitigate supply chain risks. Because our customers select recipes instead of specific ingredients, we can make adjustments while maintaining a consistent, high-quality customer experience. Our innovative direct-to-consumer business model enables us to:

- eliminate middlemen and work in a direct, coordinated manner with our suppliers to reduce costs so we can make our products available affordably and at scale;

- provide consumers with differentiated, specialty ingredients, many of which are not widely available and are exclusive to us;

- develop and implement proprietary technology across our fulfillment operations to effectively manage our frequently changing, high-throughput, perishable inventory; and

- design and optimize a cost-effective delivery network capable of reaching over 99% of the U.S. population.

Our greatest strength is our highly collaborative and multidisciplinary team, which includes agricultural scientists, software and industrial engineers, data scientists, brand and direct marketers, quality and fulfillment associates, operations specialists, photographers, customer experience representatives, recipe writers, and world-class chefs. Our shared commitment to making home cooking accessible to everyone defines our work and focuses our efforts.

47.     The Company further stated the following in its Registration Statement regarding its profit margins:

In 2014, 2015, and 2016, we generated $77.8 million, $340.8 million, and $795.4 million in net revenue, respectively, representing growth of 338% from 2014 to 2015 and growth of 133% from 2015 to 2016. In the three months ended March 31, 2016 and March 31, 2017, we generated $172.1 million and $244.8 million in net revenue, respectively, representing growth of 42%. In the years ended December 31, 2014, 2015, and 2016, we incurred net losses of $(30.8) million, $(47.0) million, and $(54.9) million, respectively, and in the three months ended March 31, 2016 and March 31, 2017, we generated net income of $3.0 million and incurred a net loss of $(52.2) million, respectively. In the years ended December 31, 2014, 2015, and 2016, our adjusted EBITDA was $(26.5) million, $(42.9) million, and $(43.6) million, respectively, and in the three months ended March 31, 2016 and March 31, 2017, our adjusted EBITDA was $5.0 million and $(46.3) million, respectively. In the years ended December 31, 2014, 2015, and 2016, our net cash from (used in) operating activities was $(16.9) million,

$(26.4) million, and $(23.5) million, respectively, and in the three months ended March 31, 2016 and March 31, 2017, our net cash from (used in) operating activities was $6.0 million and $(19.0) million, respectively.

48.    The Registration Statement also stated that the Company was expanding spending on advertising, and that doing so was important to retaining existing clients and attracting new ones, and that the Company expected to continue to increase its advertising campaigns:

> "*Our growth will depend in part on our ability to cost-effectively launch marketing campaigns* that attract and retain customers and successfully promote awareness of our brand. . .  *We intend to continue investing in marketing and offering promotional discounts to drive customer acquisition.*  We are also increasingly focused on using marketing to drive customer retention, customer engagement and brand awareness, and to support that effort we have expanded our investment in offline paid marketing."

(Emphasis added).

49.    Regarding advertising spending, the Registration Statement also stated:  "*During the period from 2014 to 2016, our marketing expenses increased from $14 million to $144 million, an increase of approximately 930%.  As part of scaling our marketing strategy, we have increased marketing expenses related to all three of our major advertising channels* (offline media, online media and our customer referral program).  Beginning in 2016, however, a larger portion of our spending has been on offline channels.  We believe increased emphasis on offline channels will drive stronger brand awareness, customer engagement and, ultimately, customer retention." (Emphasis added).

50.    The Registration Statement contained the following details regarding the Company's spending on advertising:

> *We spend significant amounts on advertising and other marketing activities*, such as television, digital and social media, direct mail, radio and podcasts, and email, to acquire new customers, retain and engage existing customers, and promote our brand, and *we expect our marketing expenses to continue to comprise a significant portion of our operating expenses.*  For 2014, 2015 and 2016, our marketing expenses were $14.0 million, $51.4 million and $144.1 million, respectively, representing approximately 17.9%, 15.1% and 18.1% of net revenue, respectively.  *For the three months ended March 31, 2016 and 2017, our marketing expenses were $25.4 million and $60.6 million, respectively, representing approximately 14.8% and 24.8% of net revenue, respectively.*

(Emphasis added).

51.   The Registration Statement also stated that the following were some of the Company's key operating metrics:

| | March 31, 2015 | June 30, 2015 | September 30, 2015 | December 31, 2015 | March 31, 2016 | June 30, 2016 | September 30, 2016 | December 31, 2016 | March 31, 2017 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Three Months Ended | | | | | |
| Orders (in thousands) | 841 | 1,247 | 1,763 | 1,970 | 2,903 | 3,399 | 3,597 | 3,674 | 4,273 |
| Customers (in thousands) | 213 | 303 | 414 | 429 | 649 | 766 | 907 | 879 | 1,036 |
| Average Order Value | $ 57.77 | $ 58.74 | $ 58.01 | $ 59.21 | $ 59.28 | $ 59.40 | $ 57.12 | $ 58.78 | $ 57.23 |
| Orders per Customer | 3.9 | 4.1 | 4.3 | 4.6 | 4.5 | 4.4 | 4.0 | 4.2 | 4.1 |
| Average Revenue per Customer | $ 228 | $ 242 | $ 247 | $ 272 | $ 265 | $ 264 | $ 227 | $ 246 | $ 236 |
| Net revenue (in thousands) | $ 48,586 | $ 73,271 | $ 102,283 | $ 116,663 | $ 172,098 | $ 201,924 | $ 205,452 | $ 215,942 | $ 244,843 |
| Adjusted EBITDA (in thousands) | $ (6,689) | $ (8,525) | $ (18,310) | $ (9,352) | $ 5,048 | $ 7,976 | $ (34,627) | $ (22,018) | $ (46,265) |

*Orders*

We define Orders as the number of paid orders by our Customers across our meal, wine and market products sold on our e-commerce platforms in any reporting period, inclusive of orders that may have eventually been refunded or credited to customers. Orders, together with Average Order Value, is an indicator of the net revenue we expect to recognize in a given period. We view Orders delivered as a key indicator of our scale and growth. Orders has limitations as a financial and operating metric as it does not reflect the product mix chosen by our customers or the purchasing behavior of our customers. For example, we view Repeat Orders as a useful metric when evaluating revenue retention. We define a Repeat Order as an Order from a Customer who has previously placed an Order in any period, including the current period. Repeat Orders has limitations as a financial and operating metric as it does not measure the frequency or the value of Orders. Because of these and other limitations, we consider, and you should consider, Orders (and Repeat Orders) in conjunction with our other metrics, including net revenue, net income (loss), adjusted EBITDA, Average Order Value and Orders per Customer.

52.   The Registration Statement further stated that Blue Apron's marketing expenses per customer were declining, and that its net revenues per customer were increasing, and stated:

Using the same methodology as above, *cumulative net revenue per Customer for the six months after such Customer's first Order was $402 for 2014 cohorts, $451 for 2015 cohorts and $387 for 2016 cohorts. We believe Cost per Customer accurately represents our average marketing spend per Customer for the periods presented*. Cumulative net revenue per Customer is driven by our ability to retain and engage Customers once we have acquired them, and therefore we believe cumulative net revenue

12

per Customer accurately portrays Customer behavior relative to the costs incurred to acquire, engage and retain Customers.

We believe the above cohorted cumulative net revenue per Customer analysis illustrates our historical costs to acquire, retain and engage customers and the efficiency of our marketing expenses . . .

We further measure the efficiency of our marketing spend and the lifetime value of Customers by comparing the net contribution per Customer for an applicable cohort to our Cost per Customer.

(Emphasis added).

53.    The Prospectus also stated that Blue Apron was already in the process of introducing new products which would help increase the Company's sales and profits:

"*We are currently in the process of introducing additional product expansions* to increase both customer flexibility (the ability to select greater or fewer recipes per Order) and the number of recipe options (the ability to choose from a greater number of recipes each week). *We expect that this product expansion will favorably impact our cumulative net revenue per Customer.*"

(Emphasis added).

54.    With respect to the Company's ability to fulfill orders and achieve operational efficiencies, the Registration Statement stated:

**Operational Execution**

Our ability to effectively coordinate supply and demand and execute across our end-to-end value chain impacts our customer experience and our operating results.  We begin by working with our suppliers, often months in advance of creating our menus.  We then continue to forecast demand as well as monitor and evaluate our expected supply of ingredients, retaining flexibility to finalize recipes in the weeks leading up to shipment.  We operate three technology-enabled, refrigerated fulfillment centers that collectively employ approximately 4,600 employees as of April 30, 2017.  Each fulfillment center includes an operation that portions ingredients into exact quantities for each week's recipes using a combination of automated methods, manual labor, and warehousing, packaging and shipping operations.  We utilize a company-managed, third-party delivery network that optimizes outbound logistics, including packing materials and the choice of carrier, on a zip code by zip code basis to ensure cost-effective, timely and safe delivery of our orders.

**Capital Investment to Support our Growth**

Our strategic investments in our fulfillment center operations will significantly impact

our ability to continue to grow our business, introduce new products, increase variety to customers, and create efficiencies in our cost structure.  We have made significant investments to scale our operations and support the growth of our business, and we plan to continue this investment.  In the near term, we plan to further invest in equipping our fulfillment centers with automated portioning and packaging equipment, which we believe will increase our operational efficiency.  In 2016, we also signed leases and began building out two new fulfillment centers in New Jersey and California.

55.     With respect to cost of goods sold, the Prospectus stated:

**Cost of Goods Sold, excluding Depreciation and Amortization**

Cost of goods sold, excluding depreciation and amortization, consists of product and fulfillment costs.  Product costs include the cost of food, packaging for food that is portioned prior to delivery to customers, labor and related personnel costs incurred to portion food for our meals, inbound shipping costs, and cost of products sold through Blue Apron Wine, Blue Apron Market, and BN Ranch.  Fulfillment costs consist of costs incurred in the shipping and handling of inventory including the shipping costs to our customers, labor and related personnel costs related to receiving, inspecting, warehousing, picking inventory, and preparing customer orders for shipment, and the cost of packaging materials and shipping supplies.  ***While we expect these expenses to increase in dollar amount to support our growth, we expect such expenses to decrease as a percentage of net revenue over time as we continue to scale our business***.

(Emphasis added).

56.     The statements contained in ¶¶ 46-55 were materially false and/or misleading because the Registration Statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  Specifically, the Registration Statement failed to disclose:  (1) that rather than continue to significantly increase spending on advertising, Blue Apron had already decided to significantly reduce spending on advertising in Q2 2017, which would hurt sales and profit margins in future quarters; (2) that Blue Apron was already experiencing adverse on-time in-full rates, meaning orders were not arriving on time or with all the ingredients needed, which was hurting customer retention; (3) that the Company had run into delays in Q2 2017 with its new factory in Linden, New Jersey, a factory which is expected to eventually account for more than half of the meal kits Blue Apron sells; (4) that existing and already-materialized delays at the Company's new factory in Linden, New Jersey were resulting in additional delays in new

product rollouts, which was limiting the company's ability to gain new customers and retain existing ones; (5) that the delays being experienced by the Company would hurt the Company's bottom line in the near-term, particularly affecting the important metric of lifetime value per customer, or the net profit Blue Apron makes off a customer; (6) that the Company was not able to fully execute its new product initiatives; and (7) that Blue Apron had already decided it would be forced to change its strategic approach in managing the business for the remainder of 2017.

57.    In addition, pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto, including any known trends, issuers are required to disclose events or uncertainties that have had, or are reasonably likely to cause, the registrant's financial information not to be indicative of future operating results.  Any adverse events and/or uncertainties associated with Blue Apron's margins were reasonably likely to have a material impact on Blue Apron's profitability and, therefore, were required to be (but were not) disclosed in the Registration Statement under Item 303.  The omitted information alleged above constituted material information and trends that the Company was required to disclose under Item 303 of Regulation S-K.

58.    As of the date of the filing of this action, Blue Apron shares traded at approximately $5.67.

59.    On July 25, 2017, Blue Apron announced that Matthew Wadiak, one of the company's co-founders, was stepping down from his role as Chief Operating Officer and would transition to serve as a senior advisor to the company.

60.    On August 10, 2017, Blue Apron announced its Q2 2017 results and lowered guidance for the second half of 2017.

61.    On August 11, 2017, Defendant Canaccord Genuity, one of the underwriters who took the Company public, slashed its target price for the Company's stock from $14 to $11.

62.    Defendant SunTrust also downgraded Blue Apron's stock the same day, slashing its price target to just $5.50 from $12.

63.    Defendant SunTrust Robinson Humphrey, another underwriter who participated

15

in the IPO, also downgraded Blue Apron stock on August 11, 2017 to hold from buy after the Company disappointed investors with weaker-than-expected guidance.

64.     When Blue Apron reported earnings for Q2 2017 on August 10, 2017, it said that it had run into delays with its new factory in Linden, New Jersey.  The plant is expected to eventually account for more than half of the meal kits Blue Apron sells, but only contributed about 3% of the network's national volume in Q2 2017.  As reported by MarketWatch: "That means additional delays in new product rollouts, which will limit the company's ability to gain new customers and retain existing ones.  'While management is focused on speedy resolution and regaining execution velocity, the slowdown in business momentum highlights the risks in an operationally/logistically intensive business,' analysts wrote in a note.  'We opt to move to the sidelines given a lack of visibility on timing for a full recovery and costs associated with the effort.'"  *See* Ciara Linnane, "Blue Market Slides Another 2% Premarket as SunTrust Downgrades to Hold," MarketWatch, Aug. 11, 2017.

65.     On the conference call with analysts to discuss Blue Apron's Q2 2017 earnings, Defendant Brad Dickerson, the Company's CFO, surprised analysts by stating that Blue Apron was cutting its guidance for the second half of 2017, indicating that the delays had "changed our strategic approach in managing the business for the remainder of 2017."

66.     During the call with analysts, Defendant Dickerson also admitted that "The success of Linden is extremely important to our long-term initiatives."

67.     The delays at Linden already existed at the time of the IPO.  The first shipment from Linden occurred on May 15, 2017.

68.     Due to delays in the planned rollout of the Linden factory as well as the fact that the company did not raise as much in its initial public offering as planned, Dickerson said on the earnings call with analysts that the company would also be lowering its capital expenditure guidance.  Blue Apron had previously set guidance of $100 million to $180 million in the Prospectus for 2017 and 2018, but Dickerson said Blue Apron now expects it be between $75 million and $115 million.  Another stated reason for lowered capex guidance was the fact the

company expects to push back the opening of another new factory in California, which it had planned for 2018.

69.     Blue Apron also unexpectedly told analysts that it would be reducing spending on advertising, which will hurt its ability to attract new customers and compete with its competitors, including Amazon.  During the Q2 earnings call with analysts on August 10, 2017, Defendant Matt Salzberg, the Company's CEO, stated:  "The most significant driver of our results was the planned reduction in marketing spend between the first and second quarter. In the second quarter, we grew revenue 18% year-over-year, while reducing marketing significantly from $61 million to $35 million between the first and second quarter."  In other words, Blue Apron was only able to achieve the numbers it did for Q2 2017 by drastically reducing advertising spending in Q2 2017 from $61 million to $35 million.  This emergency reduction in advertising spending was not disclosed in the Prospectus, and was hardly what investors expected from a company which stated it was rapidly expanding and that increased spending on advertising was key to the Company's new product initiatives and future success.

70.     Commenting on the importance of the delays to the Company's key metrics, CEO Matt Salzberg stated:  "We are hyper-focused on maintaining strong performance on metrics like on-time in-full, or OTIF, to ensure seamless customer experiences and will be more deliberate in expanding our offerings to customers with the current performance levels.  *We know lower than average OTIF scores directly impact our customer lifetime values, especially for customers early in their lifecycle with us, and we have seen some impact as part of this rollout*."  (Emphasis added).

71.     In response to Blue Apron's disclosures on August 10, 2017, the Company's stock closed on August 10, 2017 at $5.14, almost half its IPO price of $10, marking the worst performance for a big IPO this year.  The stock has fallen 28% in the last month, while the S&P 500 index has gained 0.5%.

72.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have

suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action on behalf of a Class, consisting of all those who purchased Blue Apron pursuant or traceable to the Company's Registration Statement and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  The proposed Class may be identified from records maintained by Blue Apron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether the Registration Statement contained materially false and misleading statements and omissions; and

c.      Whether and to what extent Plaintiff and members of the Class have sustained damages, and the proper measure of damages.

78.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violations of Section 11 of the Securities Act
### Against All Defendants

79.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.      This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

81.      The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

82.      Defendant Blue Apron is the issuer of the securities purchased by Plaintiff and the Class.  As such, Blue Apron is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

83.      The Individual Defendants each signed the Registration Statement.   The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading and that the document contained all facts

19

required to be stated therein.   In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.   As such, the Individual Defendants are liable to Plaintiff and the Class.

84.     The Underwriter Defendants each served as underwriters in connection with the Offering.  These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein.   In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  As such, the Underwriter Defendants are liable to Plaintiff and the Class.

85.     By reason of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

86.     Plaintiff acquired shares of Blue Apron in reliance on the Registration Statement and Prospectus and without knowledge of the untruths and/or omissions alleged herein.  Plaintiff sustained damages and the price of Blue Apron's shares declined substantially due to material misstatements in the Registration Statement and Prospectus.

87.     This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

88.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

**SECOND CLAIM**

**Violations of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     Defendants were sellers and offerors and/or solicitors of purchasers of the Blue Apron securities offered pursuant to the Offering. Defendants issued, caused to be issued and signed the Registration Statement in connection with the Offering. The Registration Statement was used to induce investors, such as Plaintiff and the other members of the Class, to purchase Blue Apron securities.

91.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statement.

92.     Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

93.     The Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

94.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Blue Apron shares pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, plaintiff and the other

members of the Class who hold shares issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to defendants sued herein.  Class members who have sold their shares seek damages to the extent permitted by law.

95.     This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after Blue Apron securities were sold to the Class in connection with the Offering.

### THIRD CLAIM

**Violations of Section 15 of the Securities Act**
**Against Blue Apron and the Individual Defendants**

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of Blue Apron within the meaning of §15 of the Securities Act.  By reason of their ownership, senior management positions and/or directorships at the Company, as alleged above, these Defendants, individually and acting pursuant to a common plan, had the power to influence, and exercised the same, to cause Blue Apron to engage in the conduct complained of herein.  The Company controlled the Individual Defendants and all of Blue Apron's employees.

98.     Blue Apron and the Individual Defendants were each culpable participants in the violations of §§11 and 12(a)(2) of the 1933 Act alleged in the First and Second Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

99.     By reason of such wrongful conduct, the Individual Defendants and Blue Apron are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's securities.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    declaring this action to be a proper class action pursuant and certifying Plaintiff as Class representative;

B.    awarding Plaintiff and other members of the Class compensatory damages;

C.    awarding Plaintiff and other members of the Class rescission on their §12(a)(2) claims;

D.    awarding Plaintiff and other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.    awarding Plaintiff and other members of the Class any other relief that the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues.

Dated: August 17, 2017

Respectfully submitted,

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
Fred T. Isquith

_____s/ Fred T. Isquith_____
        Fred T. Isquith

270 Madison Avenue
New York, New York 10016
Telephone:     (212) 545-4600
Facsimile:      (212) 686-0114
E-mail:          isquith@whafh.com

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:     (858) 914-2001
Facsimile:      (858) 914-2002
E-mail:          fbottini@bottinilaw.com

*Attorneys for Plaintiff*

24

## Certification of Named Plaintiff Under the Federal Securities Laws

Rustem Nurlybayev ("Plaintiff") declares:

1.      Plaintiff has reviewed the complaint in this class action alleging violations of the federal securities laws.  Plaintiff authorizes the filing of the complaint.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this action or any other private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in the securities of Blue Apron Holdings, Inc. are attached hereto as Exhibit A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this certification, except as follows:

> *Nurlybayev v. Alibaba Group Holding Limited, et al.*, Case No. CIV535840 (Super. Ct. of Calif., Cnty. of San Mateo); and *Nurlybayev v. ZTO Express (Cayman) Inc.*, Case No. 17-cv-06130 (United States Dist. Ct., S.D.N.Y.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 16, 2017.



DocuSigned by:

Rustem Nurlybayev

—5EC4B1EFEE454ED—

Rustem Nurlybayev

EXHIBIT A

Plaintiff has made the following transactions in the securities of Blue Apron Holdings, Inc. during the class period specified in the complaint:

## COMMON STOCK

| Acquisitions: | Date Purchased | Number of Shares | Per Share Price |
|---|---|---|---|
| | 6/28/17 | 9,614 | $10.00 |
| | 7/07/17 | 500 | $ 7.50 |
| | 7/12/17 | 500 | $ 7.50 |
| | 8/09/17 | 500 | $ 5.55 |
| | | | |
| Sales: | Date Sold | Number of Shares | Price Per Share |
| | | | |

| OPTIONS | | | |
|---|---|---|---|
| Type of Option | Date | Number of Contracts Sold | Price |
| CALL | 7/11/17 | 5 | $0.50 |
| CALL | 7/24/17 | 5 | $1.05 |

- 2 -